IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                        Criminal No.: ELH-19-268

TIMOTHY HERNDON,
    Defendant.

**MEMORANDUM OPINION**

On January 22, 2020, defendant Timothy Herndon entered a plea of guilty to the offense of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.§924(c). ECF 47. The plea was tendered pursuant to a Plea Agreement.  ECF 48.  Under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence of 96 months of incarceration.  *Id.* ¶ 9.  At sentencing on June 2, 2020 (ECF 56), the Court imposed the agreed upon sentence, with credit for time served since May 16, 2019. ECF 57 (Judgment).

Herndon, who is now self-represented, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  ECF 64 (the "Motion").[1] The Motion is supported by several exhibits.  ECF 64-1 to ECF 64-5. The government opposes the Motion (ECF 72, the "Opposition"), and has submitted several exhibits.  ECF 74-1 to ECF 74-4. Defendant has not replied.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

---

[1] The Office of the Federal Public Defender has declined to supplement the Motion or to represent Herndon.  ECF 68.

### I.     Background

Herndon was charged in a two-count Indictment on May 29, 2019, with the offenses of possession of a firearm by a prohibited person, in violation of 18 U.S.C.§922(g)(1) (Count One) and possession of a stolen firearm, in violation of 18 U.S.C.§922(j) (Count Two). ECF 9. A Superseding Indictment was filed on June 19, 2018, charging Herndon with the additional offenses of distribution and possession with intent to distribute twenty-eight grams or more of a substance containing cocaine base, in violation of 21 U.S.C.§841(a) (Count Three), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.§924(c) (Count Four). ECF 15. Count Four references Count Three as the drug trafficking crime.  A Second Superseding Indictment was filed on October 9, 2019 (ECF 31), adding a charge of conspiracy to possess with intent to distribute a controlled substance, in violation of 18 U.S.C. §924(d) (Count Five).

Pursuant to the Plea Agreement (ECF 48), Herndon entered a plea of guilty on January 22, 2020, to Count Four of the Second Superseding Indictment. ECF 47.  The offense carries a mandatory minimum term of imprisonment of 60 months, with a maximum of life imprisonment. ECF 48, ¶ 3.  As noted, under Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), the parties agreed to a sentence of incarceration of 96 months (8 years) as the appropriate disposition. *Id.* ¶ 9.

In the Plea Agreement, the parties stipulated to the following facts, *id.* at 10-11:

> On May 15, 2019, United States Magistrate Judge J. Mark Coulson of the District of Maryland authorized a search and seizure warrant for 114 Maybin Circle Owing Mills, Maryland. Timothy HERNDON was the target of said warrant. On the morning of May 16, 2019, at approximately 6:01 a.m., members of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") executed the search and seizure warrant on 114 Maybin Circle, Owing Mills, Maryland. Investigators observed HERNDON inside of the residence. Investigators read HERNDON *Miranda* warnings.
>
> After being read the *Miranda* warnings, HERNDON told investigators that there was a firearm located in a shoebox in the second floor bedroom closet and that he had placed the firearm in that location. Investigators recovered that firearm,

which was a Ruger LC9S 9mm containing a magazine with six rounds of 9 mm ammunition and one round of 9 mm ammunition in the chamber.

Investigators then searched the residence and from inside the living room behind a picture frame was one clear bag containing multiple black plastic zip lock baggies of cocaine base (crack). Found on the living room table was approximately $2,000 in U.S. currency.

In the kitchen trash can under the trash bag, was a clear sandwich bag containing multiple small black zip lock baggies of cocaine base (crack). A total of approximately 82 grams of cocaine base (crack) was found in the residence. One black shopping bag containing razor blades and multiple clear plastic bags were also found in the kitchen trashcan. Additionally found in the kitchen trash can was one round of 9 mm ammunition.

Found underneath the dish washer in the kitchen were two plastic clear sandwich bags containing approximately 250 grams of cocaine and multiple clear bags containing smaller black zip lock baggies. Also under the dish washer was one Glock Model 23, 40 caliber handgun with serial number FNP372; two Glock magazines containing sixteen 40 caliber ammunition rounds; one Smith and Wesson 38 Special with serial number CVU9302 and containing 38 caliber rounds of ammunition; two 40 caliber ammunition rounds; and a Ruger 380 caliber LCP with serial number 376-45796 containing six round of 380 caliber ammunition. Also under the dishwasher was a paper bag containing a large amount of US currency. The total currency found in the house was $39,812.

Prior to its recovery by ATF, the defendant possessed the cocaine and cocaine base with the intent to sell it. Furthermore, the defendant possessed the firearms in furtherance of his distribution of cocaine base.
All events occurred in the District of Maryland.

The parties agreed that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the Guidelines for Count Four corresponded to the mandatory minimum sentence. ECF 48, ¶ 6(a). There was no agreement regarding Herndon's criminal history. *Id.* ¶ 7. However, the parties anticipated a three-point deduction in the offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. *Id.* ¶ 6(b).

The Presentence Report ("PSR") (ECF 53) reflects that the defendant, born in 1990 (*id.* at 3), had three criminal history points. *Id.* ¶¶ 22-26. This resulted in a criminal history category of II. *Id.* ¶ 27.

3

At sentencing on June 2, 2020 (ECF 56), Herndon was twenty-nine years of age.  *See* ECF 53 at 3. The PSR reflected that Herndon did not have a high school diploma or a GED.  *Id.* at 3. Defendant "reported purchasing [Oxycodone/Percocet] from the street and reported use of 100 mg a day up until May 15, 2019." *Id.* ¶ 51. Herndon also reported that he was exposed to lead paid as a child, *id.* ¶ 49, which causes memory problems. *Id.* ¶ 53.  As noted, the Guidelines called for a period of imprisonment of 60 months, i.e. the mandatory minimum. ECF 53, ¶¶ 61, 62.

Herndon is currently serving his sentence at FCI Texarkana. To date, Herndon has served approximately 50% of his sentence.  He has a projected release date of June 21, 2026.  *See Find an inmate*, Federal Bureau of Prisons,  https://www.bop.gov/inmateloc/ (last accessed May 2, 2023).[2]

Herndon filed a petition with the Warden on February 22, 2022, seeking compassionate release. ECF 64-3 at 2. His petition was denied on March 7, 2022. *Id.* at 3-4. The government agrees that Herndon has exhausted his administrative remedies. ECF 72 at 7 n. 1.

This Motion followed on May 31, 2022. ECF 64. Herndon bases his claim of extraordinary and compelling reasons for compassionate release on the COVID-19 pandemic, coupled with his family's medical history, and the conditions of his confinement, along with his severe sentence. *Id.* at 6-10. In the Motion, he seeks a sentence reduction from 96 months to the mandatory minimum of 60 months' imprisonment. *Id.* at 10.

The government contends that Herndon's "family history of diabetes, high blood pressure, and high cholesterol" cannot constitute a justification for release as Herndon's medical records do not show he personally suffers from any of those conditions. ECF 72 at 8. And, the government

---

[2] The government indicates that defendant has a release date of April 9, 2026.  *See* ECF 72 at 3.

argues that Herndon should not be granted compassionate release because he has refused to be vaccinated. *Id.* at 9. Further, the government avers that Herndon's medical records (ECF 74-1 at 93, 95) show he contracted COVID-19, and as such, he has antibodies that render him less vulnerable to the virus. ECF 72 at 10 (citing *United States v. Taylor*, JCD-14-14, 2022 WL 2311769, at *2 (E.D. N.C. June 27, 2022) ("[Defendant] has already contracted and recovered from COVID-19, thereby obtaining natural antibodies").

Additional facts are discussed, *infra*.

### III. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)). *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality in regard to a federal sentence.

*United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see, e.g., Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition

6

a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 54 F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.  And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria.  *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis."  *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[3]   In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276.  Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA.  It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v.*

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam).  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering a compassionate release motion, the district court erred by failing to address the defendant's evidence of rehabilitation).  Nevertheless, "rehabilitation alone cannot serve as a basis for

compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6. The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . . The district court may then consider postsentencing conduct or nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. However, such changes do not warrant a recalculation of the Guidelines. *Troy,* 64 F.4th at 184.

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry. The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the

sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

Of relevance, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions, and had "'a reasoned basis'" for the exercise of his or her discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments."  *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3.  That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case."  *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

12

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189. Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

### IV. COVID-19[4]

#### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5] Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. That declaration was extended on several occasions. *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms. But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, COVID-19 has infected more than 103.8 million Americans. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 20, 2023).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the

pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (August 11, 2022), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges. Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In February 2023, the CDC updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease,

cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the Body Mass Index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 54 F.4th at 832.

### B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-*

19), *How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed Apr. 20, 2023).   However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.   Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).   And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-

19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[6]

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How*

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing

_____

*the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

**C.**

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of April 19, 2023, the BOP had 145,196 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 349,798 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last updated Apr. 19, 2023).

Also as of April 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Apr. 12, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL,

https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Apr. 12,

2023).  Moreover, approximately 54.5 million Americans have received a "booster" vaccine dose,

which the CDC recommends for all persons age 5 and older.  *See id*.; *COVID-19 Vaccine Booster*

*Shots*,     CTRS.     FOR     DISEASE     CONTROL,     https://www.cdc.gov/coronavirus/2019-

ncov/vaccines/booster-shot.html (last updated Apr. 13, 2023).

### D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021,

the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep*

*Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-

falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on

Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been

declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant

and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See*

*Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021)

(noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see*

*also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J.,

Nov.   1,   2021,   https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-

challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the

seven day average in reported deaths has dropped to about 1,400 a day from daily averages above

2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About*

*Breakthrough   Infections   and   the   Delta   Variant*,   N.Y.   TIMES   (Aug.   14,   2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. But, the number of COVID-19 cases again declined. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection*

*Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.   *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 15, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.   *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021, https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").   In other words, we are in "a more endemic phase of this crisis . . . ."   *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).   Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.   Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).   He stated: "The pandemic is over.   We still have a problem with COVID.   We're still doing a lotta work on it . . . .   But the pandemic is over."   *Id.*

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, which went into effect on May 11, 2023.   *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).   And, Congress passed a joint resolution (H.J. Res. 7) to end the national emergency.   *Id.*

In any event, it appears that "virus metrics have stabilized."   Standing Order 2022-05. Indeed, as of March 10, 2023, Johns Hopkins University stopped collecting data as to the virus. *See* COVID-19 Dashboard, *supra*, https://bit.ly/2WD4XU9. And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed,

with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

With respect to the BOP, it has reported that, as of May 1, 2023, 188 federal inmates, out of a total inmate population of 145,473, and 28 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 44,057 inmates and 15,272 staff have recovered from the COVID-19 virus.  In addition, 317 inmates and seven staff members have died from the virus.  The BOP has completed 128,639 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

As to FCI Texarkana, where the defendant is now imprisoned, the BOP reported that as of May 1, 2023, out of a total of 1,266 inmates, zero inmates and zero staff members currently test positive, two inmates and zero staff members have died of COVID-19, and 595 inmates and 171 staff have recovered at the facility. In addition, 158 staff members and 1,262 inmates have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/covid19_statistics.html; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/tex/ (last accessed May 2, 2023).

## IV.  Discussion

Herndon argues that extraordinary and compelling circumstances warrant compassionate release.  As noted, he relies on the COVID-19 pandemic, as well as his family medical history, conditions of confinement, and allegedly severe sentence. ECF 64.

A review of the record indicates that Herndon is overweight.  A person is considered overweight if his BMI is 25 or higher. Herndon's height was listed as 5'6" in the PSR. ECF 53, ¶ 47. And, Herndon's most recent weight, as indicated in his medical records, is 174 pounds. ECF 74-1 at 91. That equates to a BMI of 28.1.  *See Adult BMI Calculator*, Ctrs. for Disease Control

and                                                                                    Prevention,

https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calcul

ator.html (last accessed May 2, 2023). According to the CDC, an overweight individual is more

"likely to get very sick from COVID-19." *People with Certain Medical Conditions*, *supra*,

https://bit.ly/38S4NfY. Thus, defendant's weight puts him at heightened risk due to COVID-19.

*See* ECF 53, ¶ 47; ECF 74-1 at 91.

In light of the pandemic, some courts have found that obesity, or even borderline obesity,

can serve as a basis for compassionate release. *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d

990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index

within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19.");

*United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding

an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United*

*States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese

defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United*

*States v. Dawson*, ADM-18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting

compassionate release based on the defendant's obesity).

Herndon also claims that he is more vulnerable to COVID-19 due to his family history of

"diabetes, high blood pressure, and high cholesterol." ECF 64 at 6. But, family history of a medical

condition, rather than a personal history of a medical condition, does not constitute a reason to

justify early release. *See, e.g., United States v. Evans*, TLW-05-11129, 2021 WL 5141123, at *2

n. 1 (D.S.C. Nov. 4, 2021); *United States v. Bigelow*, WEB-17-165, 2020 WL 5948265, at *3 (E.D.

N.C. Oct. 7, 2020); *United States v. Snell*, CCB-17-602, 2020 WL 4053823, at *2 (D. Md. July

20, 2020). Indeed, on the rare occasion that a court has considered family history as a factor

warranting early release, the defendant is typically diagnosed with the illness and his family history indicates further risk. *See, e.g., United States v. Croud,* JRT-18-116, 2022 WL 17584413, at *2 (D. Minn. Dec. 12, 2022) ("Moreover, the progression of his chronic kidney disease and his family history indicate that, if left untreated, Croud's disease may likely progress and require dialysis or kidney transplant."); *United States v. Adeyemi*, 470 F.Supp.3d 489, 515 (E.D. Pa. 2020) ("Mr. Adeyemi's family history of asthma, including his cousin who died from an asthma attack, indicates the potential for worsened severity of the condition."). Here, Herndon does not allege that he suffers from diabetes, high blood pressure, or high cholesterol and therefore his family history of such conditions does not warrant early release.

Nonetheless, if Herndon were to develop any of the risk factors associated with his family history, the posture of the matter would be quite different. And, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY. Indeed, numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Hilow*, JD-15-170, 2020 WL 2851086, at *4 (D.N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's

diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, CR-08-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

I note that Herndon's medical records show that he has refused medical treatment on several occasions, such as forgoing a comprehensive metabolic panel and a dental examination. *See* ECF 74-1 at 65, 97. And, of relevance here, Herndon also declined the COVID-19 vaccine on April 13, 2021. *See* ECF 74-2. Herndon's decision to refuse the COVID-19 vaccine substantially weakens his argument for compassionate release.

The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic." *Key Things to Know about COVID-19 Vaccines*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated July 20, 2022). Indeed, "vaccines are the best way to protect [an individual] and others against COVID-19." Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021), https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/. Moreover, the vaccines are central to preventing dangerous mutations. *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants*

*From    Developing*, Henry   Ford   Health   Sys.   (Sept.   27,   2021), https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants.

To be sure, "[a] prisoner has the right to refuse vaccination . . . ." *United States v. Allen*, KM-18-216, 2023 WL 314351, at *7 (D.N.J. Jan. 19, 2023).  But, "courts have rightly cast a skeptical eye on prisoners who refuse vaccination while simultaneously claiming that only release from prison will relieve the danger of COVID-19." *Id.*   And, a growing number of district court judges and appellate courts across the country, including in the District of Maryland, have reasoned that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the prisoner's claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release.

In *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021), the Seventh Circuit said: "[A]  prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an 'extraordinary and compelling' justification for release.  The risk is self-incurred."  And, in *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021), the Sixth Circuit said:  "[W]ith access to the vaccine, an inmate largely faces the same risk from COVID-19 as those who are not incarcerated."  Moreover, Judge Gallagher of this Court has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release . . . .   Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see also United States v. Ealy,* JPJ-00-104, 2023 WL 2176574, at *3

(W.D. Va. Feb. 23, 2023); *United States v. Jones,* JCD-17-22, 2022 WL 17472232, at *3 (E.D. N.C. Dec. 6, 2022); *United States v. Poulson*, RCY-18-49, 2022 WL 3970198, at *3 (E.D. Va. Aug. 31, 2022); *United States v. Dempsey*, TNM-19-368, 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, JAW-16-00103, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, JFL-18-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, JDB-19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

However, Herndon filed his Motion in May 2022.  In the time that has passed, Herndon may have been vaccinated. And, if not, he might have opted to receive the vaccine if the Court had been in a position to inform him of the consequences of a failure to vaccinate.  Therefore, under the particular circumstances of this case, Herndon's refusal to vaccinate will not serve as a basis to defeat his Motion.  *See United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release).

It is also noteworthy that Herndon previously contracted COVID-19.  And, despite his obesity, it was apparently a mild case.  *See* ECF 72-1 at 93, 96.  Nevertheless, to the extent the government claims that Herndon's previous bout with COVID-19 generally cuts against release, the argument is not persuasive. As the CDC has stated, "[a]n individual can be reinfected multiple

times" and "[r]einfections are most often mild, but ***severe illness can occur***." *See What is COVID-19 Reinfection?*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 15, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html#:~:text=Reinfections%20may%20occur%20during%20the,increase%20when%20new%20variants%20emerge.

As mentioned, Herndon was sentenced above the Guidelines, in accordance with the C Plea. *See* ECF 48.  It is true that a defendant's lengthy sentence may qualify as an extraordinary and compelling reason for compassionate release.  *See McCoy*, 981 F.3d at 286 ("[T]he district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' [] sentences[.]"); *see also United States v. Kratsas*, DKC-92-0208, 2021 WL 242501, at *4 (D. Md. Jan. 25, 2021).

At sentencing, I explained that I could reject the C Plea if I thought it "was too harsh or too lenient." ECF 74-4. I discussed the personal characteristics of the defendant that weighed in favor of leniency. *Id.* at 23-24. But, I also noted that, given the seriousness of the offense, the C Plea was reasonable. *Id.* at 25-27. In particular, I pointed out that the government presented a "strong case" at the motions hearing. *Id.* at 27. Further, I noted that Herndon pleaded guilty to the § 924(c) offense in Count Four of the Second Superseding Indictment, but, if he had been convicted of the underlying drug offense, as well as the § 924(c) offense, he would have faced a mandatory minimum sentence of at least ten years' imprisonment. *Id.* at 27; *see also* ECF 72 at 2; ECF 74-4 at 13. In light of the facts, the sentence was not unduly harsh.

Herndon also argues that his sentence is excessive "in light of changes and amendments to section 403 of the First Step Act of 2018." ECF 64 at 6. Before the FSA was enacted in 2018, "[S]ection 924(c) was interpreted as prescribing a 5-year mandatory minimum for a first

conviction, and a consecutive 25-year term for any 'subsequent' conviction—even if obtained in the same case, *i.e.,* the 'stack.'" *United States v. Ramos*, Crim. PJM-04-293, 2021 WL 826304, at *1 (D. Md. Mar. 4, 2021). But, "Section 403 of the First Step Act re-wrote § 924(c) to prohibit stacking where a prior § 924(c) conviction had not become final." *United States v. Jones*, PJM-94-0441, 2022 WL 3139810, at *2 (D. Md. Aug. 4, 2022).

However, Herndon's charges were not stacked. Also, contrary to Herndon's assertion, his prior misdemeanor was not the government's basis "to bring a charge of 924(c)," ECF 64 at 11, as "18 U.S.C. § 924(c) does not have an element relating to prior convictions." ECF 72 at 13 (citing ECF 48). To that end, Herndon's "compassionate release motion cannot be used to challenge the validity of [his] sentence." *Ferguson*, 55 F.4th at 272.

Further, Herndon seeks release under the Eighth Amendment, claiming that it is "'cruel and unusual' punishment to hold him in unsafe conditions where he cannot 'self-care' for himself to prevent contracting the virus." ECF 64 at 9. While Herndon "could seek relief for this alleged constitutional violation in an appropriate lawsuit, '[a] motion for compassionate release is not the proper vehicle for an Eighth Amendment claim, and the Eighth Amendment protections and standards are not applicable to the compassionate release analysis under Section 3582(c).'" *United States v. Langford*, JKB-15-0539, 2022 WL 1443868, at *3 n. 3 (D. Md. May 6, 2022) (quoting *United States v. Wiley*, FDW-03-0205, 2021 WL 1234595, at *1 n.1 (W.D. N.C. April 1, 2021) (alteration in original); *see also United States v. Akers*, KHV-4-20089-1, 2022 WL 2438388, at *4 (D. Kan. July 5, 2022) ("Claims which assert potential constitutional violations should be brought—if at all—in a separate civil action, not as part of a motion for compassionate release). Nevertheless, I may consider Herndon's conditions of confinement in  ruling on his Motion. *But see United States v. Hall*, JKB-04-0323, 2022 WL 2105975, at *3 (D. Md. June 10, 2022)

("[H]arsh conditions of imprisonment occasioned by the COVID-19 pandemic are not, without more, sufficiently extraordinary and compelling to warrant compassionate release.") (internal quotations and citation omitted).

In my view, Herndon does not satisfy the "extraordinary and compelling" prong of the § 3582 analysis. Even assuming that Herndon established an extraordinary and compelling basis for release, however, release is not appropriate at this time.

B.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

Rehabilitation efforts should be considered in regard to the Motion. *See Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410-12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021)

("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

Moreover, I am mindful that courts place significant weight on a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1). The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *McDonald*, 986 F.3d at 412; *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts). A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii).

Herndon has engaged in rehabilitative efforts. Significantly, his efforts include completing his GED while in BOP custody. ECF 64-4 at 3. And, Herndon has had no disciplinary issues from the time of his incarceration until April 6, 2022. *Id.* Herndon also avers that he has a "demonstrated release Plan" and "absolutely no history of violence." ECF 64 at 8. The government has not proffered evidence that undermines Herndon's rehabilitation or good conduct while incarcerated. Herndon's rehabilitation is "a significant factor" in determining whether a sentence reduction is warranted. *United States v. Ogun*, ___F.Supp.3d___, 2023 WL 2207114, at *10 (E.D. Va. Feb. 24, 2023). But, rehabilitation alone does not warrant a defendant's immediate release. *Davis*, 2022 WL 127900, at *1.

The government expresses concern about the danger Herndon would pose to the community, due to the seriousness of his offense. ECF 72 at 12-14. This is a valid concern.  Four firearms were found at defendant's residence, along with about $40,000, ammunition, and 250 grams of cocaine or cocaine base.  Indeed, at sentencing I characterized the offense as "disturbing." ECF 74-4 at 25.

Moreover, defendant's early release would not promote respect for the law.  And, even though Herndon's Plea Agreement was entered in January 2020, prior to general awareness of COVID-19, he was sentenced in June 2020. By then, the hardship associated with the pandemic was known. ECF 74-4 at 3. Simply put, this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.

## V.  Conclusion

For the reasons set forth above, I shall deny the Motion.  An Order follows, consistent with this Memorandum Opinion.


Date: May 25, 2023                                         /s/
                                    Ellen L. Hollander
                                    United States District Judge


35